FILED
SUPERIOR COURT
OF GUAM

2018 MAR 22 AM 9: 02

CLERK OF COURT

BY:

**IN THE SUPERIOR COURT
OF GUAM**

M ELECTRIC CORP.,                           )          Case No. CV1423-10
                                            )
                    Plaintiff,              )
                                            )
        vs.                                 )
                                            )
PHIL-GETS (GUAM) INTERNATIONAL )            **FINDINGS OF FACT AND**
TRADING CORP., DBA J&B MODERN )             **CONCLUSIONS OF LAW**
TECH, AND CHUNG KUO INSURANCE )
COMPANY, LTD.,                              )
                                            )
                    Defendants.             )

**INTRODUCTION**

This matter came before the Honorable Michael J. Bordallo on remand from the Supreme Court of Guam's December 28, 2016 Opinion in <u>M Electric Corp. v. Phil-Gets (Guam) Int'l Trading Corp.</u>, 2016 Guam 35. Plaintiff M Electric Corporation is represented by Attorney Thomas Tarpley. Defendants Phil-Gets (Guam) International Trading Corporation and Chung Kuo Insurance are represented by Attorney Seth Forman. On remand, the Court ordered the parties to submit briefs on the no damages for delay issue by October 27, 2017. Having reviewed the briefs, arguments, record, and applicable law, the Court issues the following Findings of Fact and Conclusions of Law.

ORIGINAL

## BACKGROUND

This matter arises out of Plaintiff M Electric Corp.'s ("MEC") August 19, 2010 Complaint alleging non-payment for two subcontracts with Defendant Phil-Gets (Guam) International Trading Corp. ("J&B"). On February 10, 2012, the Court granted Defendants' Motion for Summary Judgment finding that the "no damage for delay" ("NDFD") clauses in the subcontracts exculpated J&B from liability to Plaintiff for damages resulting from delays in the performance of Plaintiff's work. Dec. & Order, 7 (Feb. 10, 2012). On March 21, 2012, MEC filed a Notice of Appeal. On December 27, 2012, the Supreme Court of Guam reversed this Court's Decision and Order and remanded the matter for further proceedings. The Supreme Court of Guam determined that NDFD clauses are enforceable in Guam and that summary judgment was improper because exceptions to the NDFD could apply in this matter. M Electric Corp. v. Phil-Gets (Guam) Int'l Trading Corp., 2012 Guam 23 ¶ 49.

The Court conducted a bench trial on November 5 and 13, 2014 where the parties presented the testimony of witnesses and other evidence. Based on the Court's factual findings, it concluded that no exceptions to the NDFD clauses applied to the subcontracts. Additionally, the Court denied MEC's excavation claim. On June 17, 2015, MEC filed a Notice of Appeal. The Supreme Court of Guam found, *inter alia*, that the NDFD clauses stated in the prime contracts covers the type of delays incurred by MEC. M Electric Corp. v. Phil-Gets (Guam) Int'l Trading Corp., 2016 Guam 35 ¶ 98 ("M Elec. I"). The Supreme Court of Guam remanded the issue back to this Court, tasking it to "determine whether the delays giving rise to MEC's standby claim satisfy the first recognized exception, given the facts and circumstances." Id. ¶ 88. On remand, the Court ordered the parties to submit supplemental briefs on the NDFD issue by October 27, 2017. The Court took the matter under advisement on November 20, 2017.

## ISSUE

1. Whether the first exception to a No Damage for Delay clause applies in this matter.

## FINDINGS OF FACTS

By a preponderance of evidence, the Court makes the following Findings of Fact:

1. Guam Power Authority ("GPA") solicited bids for the Macheche-GIAA and Macheche-Harmon San Vitores projects in local newspapers of general circulation.

2. A pre-bid conference was held on September 13, 2007 and was open to the public.

3. At the Conference GPA's Joven Acosta informed those in attendance that GPA was unsure of the location of underground utilities and that it had been challenging to secure encroachment permits from the Department of Public Works ("DPW"). Acosta warned bidders of the no damages for delay clauses in the contracts and indicated that bidders should increase their bids if they were concerned about delays. GPA anticipated that project delays were likely. Further, because GPA knew its design work was prepared with insufficient data and adjustments would have to be made in the field, it wanted to make sure that bidders would not be surprised with additional costs.

4. Noel Lomtong and Carlos Nunez were present at the pre-bid conference. Both Mr. Nunez and Mr. Lomtong identified their company as "M Electric" on the sign in sheet. Mr. Nunez was employed by MEC at the time of the conference and gave MEC's phone number as his contact number. Mr. Lomtong was MEC's project engineer.

5. GPA awarded J&B the contracts for the Macheche-GIAA and Macheche-Harmon San Vitores projects.

6. On March 24, 2008, MEC became a subcontractor to J&B, the prime contractor on the Macheche GIAA project pursuant to the plans and specifications prepared by TG Engineer. MEC's subcontract was for $2,000,000.00 and had a completion date of

December 2008.

7. On April 16, 2008, MEC became a subcontractor to J&B, the prime contractor for the Macheche-Harmon San Vitores project pursuant to the plans and specification prepared by Winzler & Kelly. MEC's subcontract was for $3,490,000.00 and had a completion date of January 13, 2009.

8. Both subcontracts stated that "time was of the essence in the subcontractor's performance of this agreement." Section 10.1 of each subcontract provided that MEC would get all permits necessary for completing the work. At first, J&B tried to have MEC get the permits, but since MEC could not afford to do so, J&B got the permits in an effort to avoid delays.

9. MEC did not have the bonding capacity to apply for the permits and the bonds that are required by DPW. J&B obtained the permits and paid the premiums for the bonds and never back-charged MEC for those costs.

10. Each subcontract provided that MEC would provide a construction survey, staking and Ground Penetration Radar (GPR). The purpose of GPR was to trace the location of the existing underground utilities.

11. The prime contracts each provided that change orders would be determined by the actual cost of labor, permanent materials, equipment rental, power and consumable supplies, insurance and a fixed fee not to exceed 15% of the net cost for supervision, overhead, bond, profit, and other general expenses.

12. Both of MEC's subcontracts provided,

Section 3.3. In the event the Subcontractor is delayed in completing the Work by the act, neglect, delay or default of the Contractor or the Owner, or of any other subcontractor employed by the Contractor, then the time fixed for completion of the Work shall be extended for a period equivalent to the time lost, in the sole discretion of the Contractor, provided that no extension shall be granted unless written claim is made

by Subcontractor within five (5) days from the inception of such delay. The extension of time hereinabove provided for shall be Subcontractor's exclusive remedy in the event of such a delay, no matter how or by whom caused.

13. Both the prime contracts provided that no charge for extra work would be approved unless approved in writing.

14. After MEC signed the Macheche-GIAA subcontract on March 24, 2008, it was notified to begin its survey of the site with GPR in June 2008. Noel Lomtong completed this survey in August 2008. Survey drawings E2.6 through E2.9 show that subsurface utilities existed that were not shown on the design drawings where TG Engineers planned the placement of manholes 8 through 13.

15. J&B gave MEC notice to begin highway excavation in the last week of September 2008. Subsequently, MEC mobilized all the heavy equipment necessary to perform the work.

16. MEC worked continuously on the project until March 30, 2009. On that date, it was unable to proceed with excavation between manholes 8 to 13 because the necessary highway encroachment permits from DPW had not been granted. A permit from the U.S. Air Force to dig below an existing fuel line that was correctly shown on the contract drawings had also not yet been obtained.

17. From March 30, 2009 to July 11, 2009, MEC did not have the necessary permits to continue work. During this time, MEC incurred heavy equipment rental charges on a daily basis. MEC was able to lay off its labor force during this delay and did not incur any standby labor costs.

18. DPW would only issue permits for one segment of the work at a time, generally from manhole to manhole. A separate traffic control plan was required for each segment.

Even if the contractor had all GPR work done for the entire project, DPW would only issue permits for one segment at a time. MEC had prior knowledge and experience with this rule

19. GPA's Joven Acosta testified that it typically takes a month or so to get DPW permits but that on earlier projects there was a lot of unreasonableness from DPW. The parties here were verbally advised by GPA that they should factor delays into their bids because permits from DPW could be a challenge.

20. MEC resumed work on July 11, 2009. On August 17, 2009, MEC stopped work because manhole 9 needed to be relocated because of an existing Guam Telephone Authority ("GTA") line underneath its proposed location and the necessary permit had not been acquired.

21. There were problems with permits for excavations from manholes 8 to 10 in the Macheche-GIAA project which resulted in delays. GPR showed a sewer line in the vicinity of the location for manhole 9 on Route 16. DPW advised J&B to try and relocate the manhole because of the sewer line. After several meetings involving GPA, DPW, MEC and J&B, DPW agreed to the relocation of the manhole to a place at the back of Midpac Far East, pending a survey of the new location.

22. There were also problems with fuel lines owned by the federal government between manholes 4, 5, 12, and 13. Prior to obtaining approval for these manholes, J&B had to obtain environmental assessments. While it took time to complete these assessments, the issues with the fuel lines should not have delayed trenching.

23. MEC resumed work on October 15, 2009, and there were no further delays on the project.

24. J&B tried to assist MEC so it could complete the work quickly. It subsidized MEC's purchase of materials, such as paying MEC's first billing before the construction started to help MEC purchase steel plates needed for the project. It also helped MEC with problems getting materials from Hawaiian Rock.

25. In November 2009, MEC completed its projects and was later paid the full contractual amount under the subcontracts for the two projects.

26. On November 27, 2009, MEC presented to J&B its claim for equipment standby costs as a result of the delays. The total direct cost claimed is $321,699.60 for 162 calendar days of delay. To this, MEC added 25% for overhead and then 10% profit plus 4.17% for GRT for a total claim of $460,782.40.

27. While the projects were underway, MEC did not present J&B with billings or documents for standby costs or additional trenching costs. The subcontract required prior approval of change orders and normally subcontractors request changes to compensation promptly after encountering problems.

28. When MEC encountered delays, it was not notified how long the delay would last; it was simply instructed to stand by. MEC therefore determined it was necessary for it to keep its equipment ready.

29. MEC's claim for delay damages included both rental costs for equipment rented by MEC and charges for equipment owned by MEC. Of the $1,985.80 per day claimed by MEC for equipment rental, $879.50 was for equipment owned by MEC.

30. MEC's President, Mr. Moises, testified that the standby damages MEC claimed for the equipment it owned were less than the standby damages it claimed for rented equipment. However, MEC claimed delay damages of $6.65 per day for rented 6' x 20'

steel plates, and claimed the same $6.65 per day for MEC-owned 6' x 20' steel plates.

31. MEC did not produce any invoices, bills, or receipts for equipment rental.

32. MEC claims delay damages or standby costs for the Macheche-GIAA project for two periods of time when work was delayed pending issuance of permits: (1) from March 30, 2009 to July 11, 2009, for which MEC claims 103 days; and (2) from August 17, 2009 to October 15, 2009, for which MEC claims 59 days. The alleged delays total 162 days. These are the only delay damages claimed by MEC.

33. MEC could only perform open trench excavation. Open trench excavation cannot be done during inclement weather and rain. During the time periods encompassed by MEC's claim for delay damages, there were 33 days when work was or would have been delayed due to heavy rain.

## CONCLUSIONS OF LAW

Based on the above findings of facts, the Court makes the following Conclusions of Law.

### Exception to the No Damage for Delay clause

No damage for delay ("NDFD") clauses "exculpate an owner from liability for damages resulting from delays in the performance of the contractor's work by ordinarily limiting a contractor's remedy to an extension of time." M Elec. I, 2012 Guam 23 ¶ 33. These clauses are enforceable in Guam, subject to the following exceptions: (1) unreasonable delays not contemplated by the parties when the agreement was made; (2) delays not covered by the plain language of the clause; (3) delays caused by the contractor's bad faith or its willfull, malicious, or grossly negligent conduct; and (4) delays resulting from a breach of a fundamental obligation of the contract. M Electric Corp. v. Phil-Gets (Guam) Int'l Trading Corp., 2016

Guam 35 ¶ 73 ("M Elec. II"). In M Elec II, the Supreme Court of Guam ("Supreme Court") found that the "delays at issue fall within the scope of the NDFD clause, subject to any applicable exceptions." Id. ¶ 78.

On remand, the Supreme Court tasked this Court to "determine whether the delays giving rise to MEC's standby claim satisfy the first recognized exceptions, given the facts and circumstances." Id. ¶ 88. To aid in making this determination, the Supreme Court provided a great deal of guidance on the issue. The Supreme Court explained

> In order to satisfy the first exception, the trial court must find either (1) that both the type of delays was unforeseeable and the actual delays experienced were of an unreasonable duration, or (2) that the duration of delay reached the level of manifestly extreme unreasonableness – even if the delays were of a type theoretically contemplated.

Id. Putting it another way, the Supreme Court clarified that "if the type of delays was foreseeable, then the first NDFD exception does not apply unless the delays were of a manifestly extreme duration." Id.

The first part of this Court's analysis is to determine whether the delays at issue were foreseeable or contemplated by the parties in making the agreement. The delays MEC claims were caused by the inability to timely procure highway encroachment permits and the necessary adjustments made when encountering existing subsurface utilities. The Court finds that GPA's Joven Acosta apprised everyone present at the pre-bid conference that securing highway encroachment permits from DPW posed a challenge to the timely completion of a project. Further, the Court finds that Mr. Acosta advised potential bidders to account for the possible delays associated with DPW permits in their bid. Additionally, the Court finds that Mr. Acosta informed those present at the pre-bid conference that because GPA was working with limited data with respect to existing utilities, adjustments would need to be made out in the field. The Court also finds that MEC had two representatives at this pre-bid conference,

Mr. Nunez and Mr. Lumtong. Thus, the Court finds that MEC was aware of the risks involved in the Macheche-GIAA project and that these risks could result in delays. Additionally, the contract between MEC and J&B included the NDFD provision indicating that the parties contemplated the possibility of delays. The Court has not been presented with sufficient evidence to prove that the parties were unaware or did not contemplate the challenges posed by the need for highway encroachment permits and the existing subsurface utilities. Under these facts, the Court concludes that the delays caused by untimely procurement of highway encroachment permits from DPW and the necessary on-field adjustments were foreseeable delays.

Because the Court determines that the delays at issue were foreseeable, the next part in this Court's analysis is to determine whether the delays were of a manifestly extreme duration. This Court looks to other jurisdictions for guidance in determining whether the delays were of a manifestly extreme duration. In New York, one exception to the enforcement of a NDFD clause is whether the delays are "so unreasonable that they constitute an intentional abandonment of the contract by the contractee." Travlers Cas. & Sur. Co. v. Dormitory Authority-State of New York, 735 F.Supp.2d 42, 58 (S.D. N.Y. 2010); see also Corinno Civetta Const. Corp. v. City of New York, 493 N.E.2d 905, 912 (Ct. App. N.Y. 1986) (explaining that in order to avoid NDFD clause delay must be "so unreasonable that they connote a relinquishment of the contract by the contractee with the intention of never resuming).

In Law Co., Inc. v. Mohawk Const. & Supply Co., Inc., the District Court found that an eight-month delay was not "sufficient to deny the application" of the NDFD clause. Law Co., Inc. v. Mohawk Const. & Supply Co., Inc., 702 F.Supp.2d 1304, 1324 (D. Kan. 2010). The court found that during the delay, the parties were in frequent communication regarding the delay and efforts to shorten it. Id. As a result, the court found that the evidence demonstrated

that a reasonable contractor would not have understood the eight-month delay as an abandonment of the contract. Id. Additionally, in White Oak Corp. v. Dept. Transp., the Supreme Court of Connecticut found that a sixth-month delay was not unreasonable and did not constitute an exception to the NDFD clause. White Oak Corp. v. Dept. Transp., 585 A.2d 1199, 1204-05 (Conn. 1991). Further, the White Oak court found that the delay was insufficient to constitute an abandonment of the contract. Id.

In this case, MEC experienced two delays totaling 162 days – 103 days from March 30, 2009 to July 11, 2009 and 59 days from August 17, 2009 to October 15, 2009. Individually and collectively, the delays are of a smaller duration than those analyzed in Mohawk and White Oak. Additionally, like the projects in Mohawk and White Oak, the delays did not cancel or end the project, and MEC completed its performance. Further, the Court has not been presented with sufficient evidence to prove that the delays constituted an abandonment of the contract. Both parties understood that timely securing highway encroachment permits and making on-field adjustments around existing utilities were challenges that could result in delays. The project was not abandoned when these challenges arose. Instead, MEC continued its work when the issues were resolved. Accordingly, the Court finds that the 162-day delay was not of a manifestly extreme duration. Based on the facts and circumstances of this matter, the Court concludes that the first exception to the enforceability of the NDFD clause is neither satisfied nor applicable in this case.

\\

\\

\\

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds that the first exception to the enforceability of the no damage for delay clause in the subcontract between MEC and J&B is not satisfied. MEC is unable to recover damages for its standby claim.

SO ORDERED, this 22 day of _____March_____ 2018.



HONORABLE MICHAEL J. BORDALLO
Judge, Superior Court of Guam

SERVICE VIA COURT BOX
I acknowledge that a copy of the original hereto was placed in the court box of:
T. Tainley
REV
Date: 3-22-18   Time: 4:43 PM
Jazmine K. C. James